**TRIPLE TEE GOLF, INC., Plaintiff,**

v.

**NIKE, INC., et al., Defendants.**

No. 4:04–CV–302–A.

United States District Court,
N.D. Texas,
Fort Worth Division.

Aug. 10, 2007.

Edward E. Casto, Jr., Jonathan T. Suder, Lauren M. Lockett, Friedman Suder & Cooke, Fort Worth, TX, Melvin K. Silverman, Silverman Santucci, Newark, NJ, Michael Inglassi Santucci, S. Tracy Long, Silverman Santucci, Fort Lauderdale, FL, for Plaintiff.

Robert Daniel Martinez, Charles G. Pouls, Michael H. Martin, Kirkley Schmidt & Cotten, Fort Worth, TX, Christopher J. Renk, J. Pieter Van Es, Mark T. Banner, Michael J. Harris, Banner & Witcoff, Chicago, IL, for Defendants.

*MEMORANDUM OPINION
and ORDER*

McBRYDE, District Judge.

On July 13, 2007, defendants, Nike, Inc., Tom Stites & Associates, Inc. ("Stites, Inc."), and John Thomas Stites, III ("Stites"), filed a motion to dismiss the complaint of plaintiff, Triple Tee Golf, Inc., for lack of standing, which was supported by an appendix of evidence filed with the motion. Defendants filed an opposition in response to the motion, likewise accompanied by an appendix of evidentiary material. Defendants' reply to

the response supplied additional evidentiary material. After having reviewed the motion to dismiss, the response in opposition, the reply, the supporting evidentiary material, the pleadings, and other pertinent parts of the record of this action, the court concluded, for reasons set forth in an order the court signed in this action on July 26, 2007, that the motion should be deemed to be a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. The court, by the July 26 order, gave each side until August 7, 2007, for submission of any additional material it wished the court to consider in support of its position pertinent to the deemed Rule 56 motion. After having considered all of the relevant material in the record, the court has concluded, for the reasons stated below, that the deemed motion for summary judgment should be granted.

## I.

### Grounds of the Motion

Summed up, the grounds of the motion are that plaintiff has not shown, and cannot show, that when it filed this action it had ownership of the alleged trade secrets involved in this action or, much less, of rights essential to the claims that plaintiff is asserting for misappropriation of the alleged trade secrets. Defendants note that the only credible evidence of any transfer or assignment to plaintiff of any aspect of plaintiff's claims is the written assignment dated June 29, 2005, from Jack Gillig ("Gillig") to plaintiff of all his "rights, title and interest in, and all proprietary intellectual property rights including trade secrets, copyrights, trademarks and the good will associated therewith, relating to the 'Golf Club System Ideas,'" as described in the document. App. to Mot. at 1.

Defendants contend that the June 29, 2005, assignment, even if it were otherwise sufficient, would not benefit plaintiff in this action because the action was initiated approximately one-and-a-half years before that document was executed. Defendants further contend that, even if the June 29, 2005, document had been timely executed, it did not transfer ownership to plaintiff of the alleged rights plaintiff claims Gillig obtained from his dealings with Stites in September 2000, which are essential to all of plaintiff's claims in this action.

In the July 26 order converting the motion to dismiss to a Rule 56 motion, the court informed the parties that the following summary judgment principles would be applied in evaluating whether the deemed Rule 56 motion should be granted:

A party is entitled to summary judgment on all or any part of a claim as to which there is no genuine issue of material fact and as to which the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial burden of showing that there is no genuine issue of material fact. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. The movant may discharge this burden by pointing out the absence of evidence to support one or more essential elements of the nonmoving party's claim "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has carried its burden under Rule 56(c), the non-moving party must do more than merely show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party opposing the motion may not rest on mere allegations or

denials of pleading, but must set forth specific facts showing a genuine issue for trial. *Anderson,* 477 U.S. at 248, 256, 106 S.Ct. 2505. To meet this burden, the nonmovant must "identify specific evidence in the record and articulate the 'precise manner' in which that evidence support[s][its] claim[s]." *Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir.1994). An issue is material only if its resolution could affect the outcome of the action. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Unsupported allegations, conclusory in nature, are insufficient to defeat a proper motion for summary judgment. *Simmons v. Lyons,* 746 F.2d 265, 269 (5th Cir.1984).

The standard for granting a [motion for] summary judgment is the same as the standard for a directed verdict. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. If the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita,* 475 U.S. at 597, 106 S.Ct. 1348.

*Lockheed Martin Corp. v. Network Solutions, Inc.,* 141 F.Supp.2d 648, 652–53 (N.D.Tex.2001). And, the court informed the parties by the July 26 order that the court considers the issues directly or indirectly raised by defendants in the deemed Rule 56 motion to include the contentions that

there is no genuine issue of fact for trial relative to plaintiff's entitlement to sue defendants on the claims alleged in the complaint because (a) plaintiff cannot adduce evidence that there was an assignment that gave plaintiff the right to pursue the claims, or (b) if there was an assignment, plaintiff cannot adduce evidence that it was timely or that it in fact vested in plaintiff the right to pursue the claims asserted in this action, or (c) even if there is evidence supporting plaintiff's contention of a valid, effective, and timely assignment, when the record taken as a whole is considered it cannot lead a rational trier of fact to find for plaintiff on those issues.

July 26, 2007, Order at 6–7.

## II.

*Plaintiff's Opposition to the Motion*

A major thrust of plaintiff's opposition to the motion to dismiss was that the issue of ownership, *vel non,* by plaintiff of the claims it is asserting in this action is one that should be resolved either through the vehicle of a Rule 56 motion for summary judgment or at trial by a jury.[1]

In addition, plaintiff called the attention of the court to evidentiary material plaintiff contends supports a finding of fact that plaintiff did own when it filed this action the right to assert the claims it has asserted. Alternatively, plaintiff contends that defendants do not have basis for challenging plaintiff's contention that it had the right to bring and pursue this action based on an assignment from Gillig. Finally, in the further alternative, plaintiff says that "if the Court determines that Gillig, rather than Triple Tee, is the real party in interest, Triple Tee submits that a substitution of parties is the appropriate remedy under Rule 17(a)." App. to Opp'n to Mot. to Dismiss at 17.

## III.

*The Summary Judgment Record as it Pertains to Ownership, Vel Non, by Plaintiff of the Claims it is Making in this Action*

The court is providing in this section a description of all parts of the summary

---

1. The court agreed with plaintiff to an extent of converting the motion to dismiss to a Rule 56 motion.

judgment record that bear on the issue of ownership, *vel non*, by plaintiff of rights essential to the assertion of the claims it is making in this action. With one exception, the material is presented chronologically, using the dates when the material became a part of the record in this action. The exception has to do with the purported minutes and resolutions of corporate action taken on December 3, 2004, which are placed where they logically fit in the sequencing. Because of the nature of the testimony given on the subject of assignment, *vel non*, the court in most instances quotes the testimony verbatim.

A. *The Allegations of the Original, First Amended, and Second Amended Complaints.*

In the complaint by which the action was instituted in the Southern District of Florida in January 2004 plaintiff alleged that on or about September 25, 2000, Gillig, at a meeting with Stites, reviewed with Stites what Gillig considered to be his trade secrets, Compl. at 4, ¶ 18, and that during their meeting Stites agreed as a condition to Gillig's disclosure that all trade secrets disclosed by Gillig to Stites regarding golf club and golf equipment concepts would be kept in absolute confidence, *id.*, ¶ 19. The trade secrets allegedly disclosed by Gillig to Stites on September 25, 2000, are referred to in the complaint as POWERHEAD technology. *Id.* at 4–6, ¶¶ 20–25, 29. Plaintiff alleged that "[o]n or about October 13, 2000, Gillig assigned to [plaintiff] all of his trade secrets associated with his POWERHEAD technology." *Id.* at 9, ¶ 41.

After the case was transferred from the Southern District of Florida to this court, plaintiff filed a first amended complaint on May 13, 2004, and then filed a second amended complaint on May 24, 2004. In each of those documents plaintiff made basically the same allegations it had made in its original complaint that are men-

tioned in the immediately preceding paragraph. First Am. Compl. at 8, ¶ 39; Second Am. Compl. at 7, ¶ 39.

Defendants put the truthfulness of the allegations made by plaintiff concerning an assignment from Gillig to plaintiff on October 13, 2000, in issue by replying, with reference to those allegations, in the answer defendants filed June 14, 2004, that defendants were without knowledge or information sufficient to form a belief as to the allegations, and "therefore they are denied leaving Plaintiff to strict proof thereof." Defs.' Answer and Affirmative Defenses at 12.

B. *Defendants' Request for Production.*

In July 2004 defendants served on plaintiff a request for production of documents that included, as request number 20, a request that plaintiff "produce all documents comprising ... assignments ... affecting rights in Plaintiff's ideas and concepts relating in any way to golf clubs and golfing equipment, including but not limited to each of Plaintiff's alleged 'trade secrets.'" App. to Reply in Supp. of Mot. to Dismiss at 162. The court can infer from the record that plaintiff did not produce anything pursuant to the request for documents pertaining to an assignment.

C. *Plaintiff's Rule 26(a)(1) Disclosures.*

In the Rule 26(a)(1) initial disclosures plaintiff made in this case in August 2004 plaintiff purported to list in Schedule A attached to the disclosures "[t]he identity and known contact information of individual[s] likely to have discoverable information relevant to Plaintiff's claims, *with the subject(s) which each individual is likely to possess ...*." App. to Reply in Supp. of Mot. to Dismiss at 147 (emphasis added). The Schedule A listed Gillig, Tamer Fahmy ("Fahmy"), and Ken Bronchick ("Bronchick"). *Id.* at 150–51. No mention is

made under the heading of "Subjects of the Information" alongside the names of Gillig, Fahmy, or Bronchick of any assignment or transfer of trade secrets or of anything pertaining to ownership by plaintiff of the rights essential to the claims plaintiff is making in this action. *Id.*

D. *The Purported Minutes and Resolutions of December 3, 2004, Action of Plaintiff's Board and Shareholders.*

At the hearing held in this action on July 18, 2007, counsel for plaintiff produced, apparently for the first time,[2] copies of what purport to be minutes of special meetings of the shareholders and board of directors of plaintiff held December 3, 2004, and what appears to be a set of resolutions adopted by plaintiff's board of directors, which show to have been signed by Gillig, Bronchick, and Jim Doherty on April 29, 2005, and by Fahmy on May 5, 2005. Court Ex. 5 to July 18, 2007, Hr'g. at 8th & 9th pp. Gillig, Bronchick, Jim Doherty, and Fahmy are shown to be the sole shareholders of plaintiff as of the date the resolutions were signed. *Id.* at 9th p.

The document shows that the only director who participated in the December 3, 2004, board meeting was Fahmy.[3] The instant litigation ("Litigation") is discussed in Items III, IV, V, and VI of the minutes of that meeting. Pertinent parts of Item V are as follows:

The fifth item of business taken up was the intellectual property at issue in the Litigation.... A *discussion ensued regarding the securing of the intellectual property rights at issue in the Litigation.* Clair Lucas was discussed. While all present believe that Clair Lucas has no legitimate claims as to any intellectual property at issue in the Litigation, since her sole contribution was to prepare a sketch of Jack Gillig's ideas at Jack Gillig's direction, it was decided that it was in the best interest of the company to enter into negotiations with Clair Lucas to resolve this matter.... In addition, *ownership of the trade secrets which are related to* the Calloway Golf case, as well as *the Nike Golf case were discussed.*

It was therefore agreed that the following actions shall be taken:

. . . .

(7) *Silverman Santucci, LLP shall prepare an assignment of the trade secrets related to* the Calloway Golf case, as well as *the Nike Golf case from Jack Gillig, to the Company.*

Court Ex. 5 to July 18, 2007, Hr'g at 2nd & 3rd pp. (emphasis added).

The sixth and seventh pages of Court Exhibit 5 appear to be the minutes of the

---

2. When counsel for plaintiff produced the items that were marked Court Exhibit 5, he said that it was not requested in a document request, that it is the board minutes that discuss the assignment, and that it is being produced in the "spirit of full disclosure." Tr. of July 18, 2007, proceedings at 6. The record reflects that counsel was not being candid with the court. Had plaintiff complied in defendants' discovery requests, the document would have been disclosed in 2005. *See infra* at 682.

3. The record shows that Fahmy was the only officer and director of plaintiff from the out-

set. App. to Mot. to Dismiss at 43. In addition, Fahmy was plaintiff's sole incorporator. *Id.* at 145. Court Exhibit 5 indicates that Fahmy continued to be the only director of plaintiff through the time of the December 3, 2004, special meeting of the board of directors and that he was still the president of plaintiff. The exhibit shows that Gillig and Bronchick were added as directors and that Gillig was given the title vice president at the special meeting of the shareholders on December 3, 2004. Court Ex. 5 to July 18, 2007, Hr'g at lst–4th, 6th–8th pp.

December 3, 2004, special meeting of the shareholders. It likewise defines this action by the word of art "Litigation." *Id.* at 6th p., Item IV. Items IV, V, and VI pertain to the Litigation. *Id.* at 6th and 7th pp. Item VI reads as follows:

The sixth item of business taken up was the intellectual property at issue in the Litigation. Copies of the Complaint, First Amended Complaint, Second Amended Complaint, and the Defendant's Answers and Affirmative Defenses were presented for review by all present. *A discussion ensued regarding the securing of the intellectual property rights at issue in the Litigation.* The board of directors has recommended approval of the above stated actions, and have therefore previously approved of said action via resolution which was presented to all present and was ordered to be made a part of the minutes of the meeting.

*Id.* at 6th & 7th pp. (emphasis added).

The eighth and ninth pages appear to be a set of resolutions of the board of directors. Section IV of the resolutions, including its heading, reads as follows:

*IV. ACTIONS TO BE TAKEN TO SECURE INTELLECTUAL PROPERTY RIGHTS*

FURTHER RESOLVED THAT:

. . . .

(7) *Silverman Santucci, LLP shall prepare an assignment of the trade secrets related to* the Calloway Golf case, as well as *the Nike Golf case from Jack Gillig, to the Company.*

*Id.* at 9th p. (emphasis added).

E. *Plaintiff's February 23, 2005, Deposition, Through Gillig as its Designee.*

In January 2005 defendant Nike, Inc., noticed the taking of the oral deposition on February 23, 2005, of plaintiff, through its designee. The notice listed as one of the subjects of testimony to be covered on the deposition the following:

19. All facts supporting, refuting, or relating to Triple Tee's . . . assignment of any rights alleged in this case, includ[ing] Triple Tee's allegation that "[o]n or about October 13, 2000, Gillig assigned to TRIPLE TEE all of his trade secrets associated with his POWERHEAD technology." (*See* Second Amended Complaint, 139).

App. to Mot. to Dismiss at 102. Plaintiff gave its oral deposition pursuant to the notice by producing Gillig as its deposition designee on February 23, 2005, when plaintiff, through Gillig, gave the following testimony pertinent to the assignment issue:

Q As far as Triple Tee Golf is concerned, what contributions did Jack Gillig make to Triple Tee Golf in exchange for the shares that were issued to him?

. . . .

A Trade secrets and marketing plans.

. . . .

Q . . . did there come a point in time at which Jack Gillig [as]signed Triple Tee Golf his marketing plans and trade secrets?

A Trade secrets and marketing plans were always the intent to be the property of Triple Tee Golf.

Q *So there came a point in time when that was assigned from Jack Gillig to Triple Tee?*

A *Yeah.*

Q *When was that?*

A *Don't know.*

. . . .

Q What exactly was assigned?

. . . .

A Basically the marketing plans and the concepts.

. . . .

Q What marketing plans?

A Well, the one that you guys have gotten, you know, the marketing plan is in the paperwork that's been provided to you.

. . . .

Q What trade secrets were assigned from Jack Gillig to Triple Tee Golf?

. . . .

A I'd say the seven we're talking about.

. . . .

Q Are there any documents that reflect what trade secrets Jack Gillig assigned to Triple Tee Golf?

. . . .

A Yeah, all the art work.

. . . .

Q Other than the art work, any other documents?

. . . .

A Some written explanations within the art work.

. . . .

Q *Was there a written assignment of the trade secrets and marketing plans from Jack Gillig to Triple Tee Golf?*

. . . .

A *I'd have to go check all the documents.*

App. to Opp'n to Mot. to Dismiss at A–014–A–018 (emphasis added)

. . . .

Q You don't know?

A Right now, I don't know. I'd have to go check it. I know they're in Triple Tee Golf and that's where they are and that's where they went.

Q And that's not something you checked to prepare for your deposition today?

A No.

Q *So you don't know if there's a written assignment one way or the other?*

A *Correct.*

App. to Mot. to Dismiss at 59–60 (emphasis added).

. . . .

Q Did you turn over to your attorneys the issue of the assignment of any trade secrets or marketing plans from Jack Gillig to Triple Tee Golf, Inc.?

. . . .

A Any paperwork?

Not that I know of, no, I don't think so. Take a look in the files.

. . . .

Q Now, you indicated that you turned certain things over to your attorneys.

My question to you is: *Did you turn over to your attorneys the issue of memorializing any kind of assignment of trade secrets and marketing plans from Jack Gillig to Triple Tee Golf?*

A *No.*

. . . .

Q *Because you felt that was something that didn't need to be dealt with, with attorneys?*

. . . .

A They're separate. The trust and trade secrets are separate, and marketing plans are separate. The name might be in there, the patent might be in there, *but the trade secrets and any of the stuff were all over here; they never went over there.*

. . . .

Q But my question to you is: *Is that Triple Tee Golf didn't feel that was something it needed to deal with its attorneys about, correct?*

. . . .

A *Yeah, I guess, yeah.*

*Id.* at 64–66 (emphasis added).

F. *Deposition Testimony Given by Fahmy on April 8, 2005.*

On April 8, 2005, defense counsel took the oral deposition of Fahmy. He gave the following testimony:

Q. What did Jack Gillig contribute to Triple Tee Golf at the time of its formation?

A. His technology.

App. to Opp'n to Mot. to Dismiss at A–031.

. . . .

Q. *Do you have any understanding as to whether there ever came a point in time when Mr. Gillig assigned to Triple Tee Golf any trade secrets or technology?*

A. *There was a discussion about it at one point and I don't know what was the result of it.*

Q. Well, who was involved in the discussions?

A. It was the board of directors.

Q. *When did the discussion take place?*

A. *The last three, four months.*

Q. Okay, *other than the discussion that took place within the last three or four months, are you aware of any other information regarding any assignment from Mr. Gillig to Triple Tee Golf of any trade secrets or technology or confidential information?*

A. *Not that I am aware of, no.*

. . . .

Q. Let me direct your attention to page seven of the second amended complaint, Defendant's Exhibit Two, specifically paragraph thirty-nine. Do you see that paragraph?

A. Okay.

Q. Which reads, "On or about October 13th, 2000, Gillig assigned to Triple Tee all of his trade secrets associated with his Powerhead technology." Do you see that sentence?

A. Yes.

Q. Do you have any familiarity with the circumstances surrounding this information that's contained in this paragraph thirty-nine?

A. Just what it reads. It says he assigned his secrets associated with his Powerhead technology to Triple Tee.

Q. Okay, but *before reading this sentence just now, you didn't have any familiarity with this—*

A. *No.*

Q. *—the content of paragraph thirty-nine?*

A. *No.*

App. to Mot. to Dismiss at 54–56 (emphasis added).

G. *The Third Amended Complaint and Answer Thereto.*

In a third amended complaint filed May 10, 2005, plaintiff alleged that "[o]n or about October 13, 2000, GILLIG assigned to TTG all right [sic] title, and interest in his trade secrets associated with his POWERHEAD technology." Third Am. Compl. at 8, ¶ 41. As before, defendants responded in their answer to the third amended complaint that they were without knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denied the allegations, "leaving Plaintiff to strict proof thereof." Answer to Third Am. Compl. at 12–13.

H. *Gillig's June 1, 2005, Declaration.*

In a declaration of Gillig, which shows to have been executed on June 1, 2005, he said:

18. Triple Tee is the owner of all right, title and interest in my trade secrets and club designs through an as-

signment from me, including the right to sue for past, present, and future damages arising from any misappropriate or other wrongful use.

App. to Opp'n to Mot. to Dismiss at A–029.

I. *Gillig's June 14, 2005, Deposition Testimony.*

Then, in an oral deposition given by Gillig on June 14, 2005, he gave the following testimony:

Q By the way, inviting your attention back to your Declaration, . . .

. . . .

A Okay. Paragraph 18?

Q Uhm-hum. It says: "Triple Tee Golf is the owner of all right, title and interest in my trade secrets and club designs through an assignment from me, including the right to sue for past, present, and future damages arising from any misappropriation or other wrongful use." Do you see that?

A Yes, sir.

Q *Is there a written document evidencing the assignment ?*

A *Yes, there is one on file somewhere.* (BY Mr. Renk)

MR. RENK: *I don't believe we have been given that assignment document, counsel.*

MR. LONG: *I will check. I was under the impression you were, but if you weren't I don't have a problem with providing it [sic] you.*

MR. RENK: Thank you.

BY MR. RENK:

Q *Does the written assignment document identify the trade secrets, the seven trade secrets as they are written out in this case?*

A *No, probably not. I would have to go back and look at it.*

Q *What does it say?*

A *I don't know, I haven't looked at it in awhile.*

Q It was created in 2000 as I understand it, sometime in October of 2000?

A Yes, I would have to—like I said I don't—you know, I get things done, I put them in the files, it's not like I memorize dates on all this stuff, sorry if I don't. Some people do, but I don't.

Q It says you have the right to sue for past, present, or future damages; do you see that?

A Yes, sir.

Q *Is that what the document says?*

A *That was the intent. I believe that's what it says, Triple Tee Golf has all the rights.*

. . . .

Q *Who is aware of this assignment document at Triple Tee?*

A *I am, Tammer Fahmy is. Ken, I believe Ken Bronchick might be and Jim. I think they might have—Jim Doherty might not be.* I don't think I have to have a vote to do that, I think I could just do it, so it would be Tammer and myself, and maybe Ken Bronchick.

App. to Mot. to Dismiss at 94–96 (emphasis added).

J. *The Pretrial Order.*

In the proposed Pretrial Order the parties submitted to the court in advance of the pretrial conference held July 5, 2007, plaintiff stated as an element of its claims that "Triple Tee is the owner of Gillig's proprietary ideas and club designs through an assignment from Gillig." Pretrial Order at 3. Defendants included among their claims that "[t]here is no record of Mr. Gillig's purported assignment of the alleged trade secrets—or any other information for that matter—to [plaintiff] on October 13, 2000." *Id.* at 15 & 17.

K. *The Bill of Sale and Assignment Dated June 29, 2005.*

The controversy over whether plaintiff has ownership of the rights essential to the claims it is asserting in this case came to the forefront when, during the July 5, 2007, pretrial conference, there was a discussion as to whether there will be a need for a question to be submitted to the jury asking if Gillig had assigned ownership of those rights to plaintiff. Tr. of July 5, 2007, Hr'g at 9–10, 31–33. Plaintiff, through counsel, maintained at the hearing that there was a written assignment from Gillig to plaintiff. The court understood counsel to say that he had the written assignment at his office. *Id.* at 31–32. After some difficulty, the court was able to persuade counsel for plaintiff to produce what he was referring to as a written assignment. *Id.* at 32–33, 42–47, 48–50, 64, 70–71, 77–78.

It turned out that the document produced was not an assignment made, as plaintiff had alleged in its original and amended complaints, in October 2000, but, rather, was an assignment document that shows to have been signed on June 29, 2005, approximately one-and-a-half years after the original complaint was filed in January 2004 alleging that the assignment was made on or about October 13, 2000. The June 29, 2005, document is titled "Bill of Sale and Assignment." App. to Mot. to Dismiss at 1. The beginning part of the document reads as follows:

This BILL OF SALE made as of this 29th day of June 2005, by and from Jack Gillig, an individual and resident of the state of Florida (collectively "Seller") to Triple Tee Golf, Inc., a Florida corporation ("Purchaser").

1. For and in consideration of the shares of the company issued to Jack Gillig, other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller does hereby sell, assign, convey, transfer and deliver to Purchaser all of the rights, title and interest in, and all propriety intellectual property rights including trade secrets, copyrights, trademarks and the goodwill associated therewith, relating to the "Golf Club System Ideas" as described hereunder to have and to hold forever: . . . .

*Id.* There does not appear to be anything in the June 29, 2005, document that would constitute an assignment of any claim or cause of action against anyone or of any rights Gillig might have acquired by virtue of his dealings with Stites in September 2000. The trade secrets that show to have been assigned appear to be the same seven trade secrets that have been discussed at various points in the litigation, including the opinion of the Fifth Circuit. *See Triple Tee Golf, Inc. v. Nike, Inc.,* 485 F.3d 253, 257–59 (5th Cir.2007).

The final paragraph of the document reads as follows:

6. ACKNOWLEDGMENT OF RIGHTS: Seller hereby acknowledges and warrants that Purchaser has had the full rights herein conveyed as of October 20, 2000 the date that Purchaser issued to seller stock certificate number 2 to Seller, A copy of said stock certificate is attached hereto as ***Exhibit "B"***

*Id.* at 4.

L. *Testimony Given by Gillig on July 18, 2007.*

When testimony was taken from Gillig, individually and as designee of plaintiff, in the courtroom on July 18, 2007, Gillig said that the June 29, 2005, Assignment and Bill of Sale is the only written assignment from him to plaintiff, and that the only other assignment was a verbal agreement. Tr. of July 18, 2007, Hr'g at 9. With respect to the latter, he said;

Q. And how was that assignment made?

A. When Triple Tee was formed and there was stock being issued, stock was conveyed to me for all the trade secrets and confidential information and marketing plans, and that transaction transferred all the material to Triple Tee.

*Id.* Gillig testified that the verbal assignment was made by him to Bronchick in Bronchick's law office. *Id.* at 10. He said that he was in the law office to have Bronchick "do the formal paperwork on Triple Tee Golf and assign the trade secrets over and transfer the information." *Id.* at 11. When pressed for specifics, Gillig testified:

THE COURT: And what exactly did you tell him you were assigning to Triple Tee Golf?

MR. GILLIG: I told him I was assigning my trade secrets, my knowledge on golf, the confidential information regarding the trade secrets, the business plan, any revenues that I would make through golf competitions would go into there also as part of the company. Anything basically to do with golf would be in that company.

THE COURT: Okay. *And is that the only assignment you made to Triple Tee Golf of anything other than this Exhibit [4] assignment you looked at a minute ago?*

MR. GILLIG: *That would be correct.*

THE COURT: *Those are the only two assignments you've made.*

MR. GILLIG: *Yes, sir.*

THE COURT: *At any time.*

MR. GILLIG: *Yes, sir.*

THE COURT: *Under any circumstance.*

MR. GILLIG: *Yes, sir.*

. . . .

Q. Do You remember those exact words that you spoke to this gentleman, Mr. [Bronchick]?

. . . .

A. ... The exact words, no. His questions to me were, well, what is going into this company. And then I basically said what I just said to the judge, and that all those trade secrets, confidential information, the marketing plan, and the other things are all in Triple Tee.

THE COURT: ... *He was asking you when we do form this corporation what are they going to get for the stock they issue* ?

MR. GILLIG: *Correct.*

THE COURT: ... *And what you were telling him was what the corporation would get for the stock.*

MR. GILLIG: *Correct.*

THE COURT: Okay. *And that's what you took to be an assignment.*

MR. GILLIG: *Correct.*

*Id.* at 12–13 (emphasis added).

Gillig testified that the conversation he had with Bronchick occurred before he met with Stites in September of 2000. *Id.* at 14–15. He explained the June 29, 2005, Bill of Sale and Assignment by saying that it was prepared by corporate counsel at Silverman & Santucci, *who had suggested that the document should be prepared to confirm what had happened three or four weeks before plaintiff came into existence.* *Id.* at 18–19. He went on to explain that:

THE COURT: You know what prompted that decision or suggestion?

MR. GILLIG: I believe it came up in some conversation involved with the case, as I remember, that somebody wanted to know if it was ever done in writing and corporate counsel suggested that we get it immortalized at that point to re-convey what we had already done.

. . . .

Q. Okay. It says on or about October 13, 2000, Gillig assigned to TTG all

right, title, and interest in his trade secrets associated with his Powerhead technology.

A. Correct.

Q. I thought you testified that you did this in September.

A. It says "or about."

THE COURT: What do you mean on or about October 13? How come you picked the date October 13?

MR. GILLIG: I would imagine that's the date that was on the paperwork.

THE COURT: On what paperwork?

MR. GILLIG: The original paperwork when the corporation was founded. I guess that was the date it was officially founded.

THE COURT: You think they just picked the date that the corporation came into existence?

MR. GILLIG: Yes, sir.

THE COURT: And that is your guess as to why that date is there?

MR. GILLIG: Correct.

THE COURT: But you don't know why that date was used?

MR. GILLIG: When it was put together, the attorneys put the dates in as they occurred.

*Id.* at 19–21.

Gillig first said that he signed the Bill of Sale and Assignment in Bronchick's office in 2000, but when he noticed that the date shown by the signature was June 29, 2005, he changed his testimony to say that he signed it under the Silverman & Santucci attorneys in 2005. *Id.* at 23–24.

By way of explanation of the contents of paragraph 6 on the fourth page of the Bill of Sale and Assignment, Gillig testified:

THE COURT: Well, what did you do as of October 20, 2000, referring to that paragraph six on the fourth page in the Bill of Sale when you signed it. What did you do on October 20, 2006(sic)?

MR. GILLIG: We had verbal agreements between—the attorney and I talked about it and the conveyance of stock.

THE COURT: That was what you told me about earlier?

MR. GILLIG: Right.

THE COURT: About three or four weeks before the corporation came into existence?

MR. GILLIG: Correct.

THE COURT: Which was back in September of 2006.

MR. GILLIG: That sounds about right.

THE COURT: Okay. So this date is wrong. It should have been September 2006? I mean, 2000, September 2000?

MR. GILLIG: That's when we first started talking about it, but I think the paperwork got drafted and then it was officially signed in October.

THE COURT: What was signed?

MR. GILLIG: The actual—the corporate resolution, I guess, however the attorney did to form the corporation. And it would be all signed at that same time.

THE COURT: Oh, you think the October 20 date refers to when the corporation came into existence?

MR. GILLIG: Right around that date. I formed it all together at the same time. I went to the attorney and I said I want to put all my trade secrets and everything into this company.

THE COURT: You told us about that. You told us that happened back in September 2000, I believe; is that correct?

MR. GILLIG: Yes, sir.

*Id.* at 24–25. He added that the Bill of Sale and Assignment he signed June 29, 2005, "was just to confirm in writing what [they] had already done previously." *Id.*

at 29. According to Gillig, *he told Fahmy sometime in September 2000 that he was making an assignment to plaintiff*, explaining:

THE COURT: *Did anybody ever tell Mr. Fahmy that you were assigning anything to Triple Tee Golf, Inc.?*

MR. GILLIG: *Yes, sir.*

THE COURT: *Who told him that?*

MR. GILLIG: *I told him.*

THE COURT: *When did you tell him?*

MR. GILLIG: *It would have been even before those dates, as we were talking about it.*

THE COURT: *Sometime back before September of 2000?*

MR. GILLIG: Yes, sir. When I was getting ready to formalize this I was telling him I want to do this and do you want to be part of this? We talked about it and he wanted to know what was going to be in the company.

THE COURT: Is he a business associate of yours?

MR. GILLIG: Yes, sir.

THE COURT: Okay. *And can you tell me about when that conversation took place?*

MR. GILLIG: *That would have been the two or three months preceding coming into September and October, because we were discussing the realities of forming a corporation.*

THE COURT; So you're talking about June or July?

MR. GILLIG: Somewhere in that area.

THE COURT; Of the year 2000?

MR. GILLIG: Yes, sir.

THE COURT: And is that the only conversation you had with Mr. Fahmy on that subject?

MR. GILLIG: We had numerous conversations on that, and he was involved

with the conversations with Ken Bronchick, also.

THE COURT: About what?

MR. GILLIG: About the transference of everything to Triple Tee and forming the corporation.

THE COURT: Okay. *After the corporation was formed, did you have any conversations with Mr. Fahmy about it?*

MR. GILLIG: *About what's in the company?*

THE COURT: *Yes.*

MR. GILLIG: *Not until again in 2005 when it was recommended that it should be, you know, immortalized in writing.*

THE COURT: *When that Bill of Sale and Assignment was prepared?*

MR. GILLIG: *Correct.* We had new corporate counsel and they thought it would be prudent to do that.

THE COURT: That was when the Bill of Sale and Assignment was prepared?

MR. GILLIG: Correct.

*Id.* at 30–32 (emphasis added).

With reference to the December 3, 2004, corporate minutes and resolutions, Gillig testified:

THE COURT: Did you sign that? Is this your signature on the next to the last page?

MR. GILLIG: Yes, sir, the second one down.

THE COURT: And it shows you signed it on April 29, 2005?

MR. GILLIG: Yes, sir.

THE COURT: That is your signature?

MR. GILLIG: Yes, sir.

THE COURT: Was there any discussion at any of those meetings about the

possibility of you assigning anything to Triple Tee?

MR. GILLIG: This discussion was Silverman Santucci shall prepare an assignment of the trade secrets related to—no, that's a different one.

THE COURT: Was there anything discussed about you making an assignment to Triple Tee? Just look at it and tell me from your memory was anything discussed. Mr. Gillig?

MR. GILLIG: I'm looking at it.

THE COURT: Okay. Do you recall any such discussion?

MR. GILLIG: I believe in the meeting we discussed it a little bit that the trade secrets were in there.

THE COURT: That what?

MR. GILLIG: The trade secrets and confidential information, we talked about it a little bit, I believe.

THE COURT: Were you talking about the possibility of make an assignment from you to Triple Tee?

MR. GILLIG: We were talking about confirming the assignment that was already made.

THE COURT: Well, the entry right above your signature says: Silverman Santucci, LLP, shall prepare an assignment of the trade secrets related to Calloway Golf case, as well as the Nike Golf case from Jack Gillig, to the company.

MR. GILLIG: This would be just to reiterate what has already been done, to do it in writing.

THE COURT: Well, do you recall that discussion?

MR. GILLIG: Yes.

THE COURT: At the meeting?

MR. GILLIG: Yes.

THE COURT: And is that what led up to the document that we referred to earlier as a Bill of Sale and Assignment dated June 29, 2005?

MR. GILLIG: Correct. The attorneys thought it would be nice to reiterate it.

*Id.* at 79–80.

M. *Bronchick's July 20, 2007, Declaration.*

A July 20, 2007, declaration of Bronchick says that he has been acting in the capacity of corporate attorney for plaintiff since its date of incorporation on October 13, 2000. App. to Opp'n to Mot. to Dismiss at A–112. He said that plaintiff was formed for the purpose of holding and marketing new ideas and concepts for golf clubs, and that those ideas and concepts were previously developed by Gillig, and included the concepts that are at issue in this litigation. *Id.* at A–113. He said that at a meeting of the board of directors of plaintiff, which he called October 20, 2000, they ratified the grant of 3,950,000 shares of stock of plaintiff to Gillig in exchange for his contribution of his ideas, concepts, and related materials to Triple Tee. *Id.* He also said:

8. I always viewed Gillig's contributions to Triple Tee as an assignment of all of his rights in his ideas and concepts to Triple Tee, which, under Florida law, can be done orally and without a formal written document, especially when, as here, Gillig received consideration for the assignment.

*Id.*

With respect to the June 29, 2005, Bill of Sale and Assignment, Bronchick said:

9. In 2004, I was still a shareholder of Triple Tee. A decision was made by the company, upon the advice of counsel, to memorialize Gillig's assignment of his technology and concepts, which included the trade secrets at issue in the above litigation, to writing. Attorney Philip A. Duvalsaint drafted the Bill of Sale and Assignment document which was then executed on June 29, 2005.

10. The intent of this Bill of Sale and Assignment was always to be a memori-

alization of the prior assignment of Gillig's rights in exchange for Triple Tee stock in 2000, It was never intended to change either Gillig's or Triple Tee's rights under the prior assignment. *Id.* at A–113–14.

### N. *Duvalsaint's July 20, 2007, Declaration.*

In a declaration dated July 20, 2007, Philip A. Duvalsaint says that he is an attorney in Florida, and acted as chairman and secretary of a special meetings of the board of directors and shareholders of plaintiff on December 3, 2004. App. to Opp'n to Mot. to Dismiss at A–115. He is the one who drafted the Bill of Sale and Assignment dated June 29, 2005. *Id.* at A–116. The document was drafted "to memorialize the existing relationship between John P. Gillig Jr., a principal of Triple Tee Golf, Inc., and Triple Tee Golf, Inc." *Id.* He said, "The Bill of Sale and Assignment was drafted to and did in fact memorialize the prior oral agreements between John P. Gillig and Triple Tee Golf, Inc. with regard to the assets described therein." *Id.* He concludes the declaration with the statement, "The Bill of Sale and Assignment did not change either John P. Gillig's or Triple Tee Golf, Inc.'s rights under the prior assignment." *Id.* at A–117.

### IV.

#### *Analysis*

A. *The Court Would Have Granted the Motion to Dismiss as Originally Filed.*

 Federal courts are courts of limited jurisdiction, and a case filed in a district court is presumed to lie outside that jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). The burden of establishing the contrary rests on the party asserting jurisdiction. *Id.* Those principles apply to a jurisdictional challenge based on lack of standing as well as other challenges to subject matter jurisdiction. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103–104, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). A court may dismiss for lack of subject matter jurisdiction by considering the complaint, undisputed facts in the record, and the court's resolution of disputed facts. *Clark v. Tarrant County, Tex.*, 798 F.2d 736, 741 (5th Cir. 1986). In resolving the disputed facts, the court is empowered to hold an evidentiary hearing to the end of making findings of fact determinative of the court's jurisdiction. *Id.*

For plaintiff to establish standing to bring this action it would be required to convince the court that it obtained ownership of the right to bring the action through an assignment from Gillig. *See Gaia Techs., Inc. v. Reconversion Techs., Inc.*, 93 F.3d 774, 778–80 (Fed.Cir.1996) (*amended on reh'g in part by* 104 F.3d 1296 (Fed.Cir.1996)). If the court had decided this case on the basis of the motion to dismiss as originally filed, the court, as the finder of fact, would have resolved the assignment issue in favor of defendants. The court remains of the view that plaintiff's contention that it had a right to bring this action through assignment from Gillig is a fabrication. *See* Tr. of July 18, 2007, Hr'g at 70. The parts of the record pertaining to a purported assignment are so fraught with inconsistencies and implausibilities that the court cannot help but believe that the participants on behalf of plaintiff often have been less than candid in an improper attempt to justify the allegation plaintiff made in each version of its complaint that on or about October 13, 2000, Gillig assigned to plaintiff all his trade secrets associated with his POWER-HEAD technology.[4] Plaintiff certainly has

---

**4.** This is not the first time the court has had

concern with the lack of candor in plaintiff's

failed to prove by credible evidence its allegations and claims relative to an assignment.

However, as noted above, the court decided to convert the motion to dismiss to a Rule 56 motion, which means that, while the standing issue remains in the case, its resolution will be by summary judgment principles rather than the rules that normally would be applied for resolution of a motion to dismiss for lack of subject matter jurisdiction. The principles the court is applying are set forth on pages 678–79 of this memorandum opinion and order. The court has concluded that an application of those principles to the summary judgment record compels the conclusion, which the court has reached, that plaintiff has failed to raise an issue of fact that it has had standing to bring and pursue this action and the corollary conclusion that the ownership-of-claims element of plaintiff's alleged causes of action cannot be proved by plaintiff. The court starts the Rule 56 analysis with a detailed listing of the inconsistencies and implausibilities in the summary judgment record pertaining to plaintiff's contention that it possessed the right to initiate and pursue this action based on an assignment from Gillig.

B. *Inconsistencies and Implausibilities.*

The court is documenting under this subsection the inconsistencies and implausibilities that explain the court's conclusion that no reasonable finder of fact would find the existence of an assignment that would give plaintiff the right to assert the claims that it makes in this action,

 (1) Other than the Bill of Sale and Assignment dated June 29, 2005, and the corporate minutes and resolutions dated December 3, 2004, not a single thing has been produced by plaintiff, notwithstanding defendants' discovery requests, that constitutes, memorializes, or even mentions any assignment of anything from Gillig to plaintiff, Gillig testified on February 23, 2005, that the trade secrets and marketing plans he assigned to Triple Tee had a monetary value of either $30,000,000 or $300,000,000. App. to Mot. to Dismiss at 60–61. The record reflects that an attorney, Bronchick, oversaw the formation of plaintiff and prepared the resolution of plaintiff's board of directors issuing all of the shares of plaintiff's stock. Plaintiff's contention is that the 3,950,000 shares issued to Gillig were in exchange for his trade secrets, Bronchick himself received 50,000 shares of plaintiff at the outset.

The thought that Bronchick would not cause to be memorialized in an appropriate way that plaintiff had received in exchange for almost four-fifths of its corporate stock an asset worth perhaps as much as $300,000,000, if in fact such a thing occurred, would not be entertained by any rational fact finder. Common sense says that there was a memorialization at the time of whatever Gillig provided in exchange for his shares of plaintiff and that plaintiff consciously has withheld disclosure of the memorialization because of what it would reveal.

There are traces in the record that some kind of assignment was made from Gillig to plaintiff before June 2005. A rational fact finder would infer from plaintiff's nondisclosure of such an assignment that its contents would be adverse to plaintiff's contention that when it initiated and pursued this action it had ownership of the rights essential to the claims it is asserting. *See, e.g., Evans v.*

presentations in this case. *See Triple Tee Golf, Inc. v. Nike, Inc.*, 497 F.Supp.2d 827, 830–33 (N.D.Tex.2007).

*Robbins,* 897 F.2d 966, 970 (8th Cir. 1990).

(2) No reasonable fact finder would give Gillig's testimony concerning a purported assignment any credibility considering the discrepancies in the things he said from time to time. When he testified on February 23, 2005, as plaintiff's deposition designee (to testify on, among other subjects, any assignment of any rights alleged in this case, including the assignment alleged to have occurred on October 13, 2000), Gillig had no knowledge as to whether there was a written assignment. Gillig flip-flopped when he gave deposition testimony on June 14, 2005, saying then that there was a written assignment and that it was in the file somewhere. This is when plaintiff's counsel told counsel for defendants that he was of the impression that the written assignment already had been provided, and that it would be provided. Gillig said that he would have to go back and look at the assignment document, which he had not looked at in a while, to see if it identified the seven trade secrets that are involved in this action. He went so far as to say that Fahmy and Bronchick also would be aware of the assignment document. Finally, in direct contradiction to the already contradictive testimony he had given on February 23, 2004, and June 14, 2005, Gillig testified at the hearing on July 18, 2007, that the only written assignment document was the June 29, 2005, Bill of Sale and Assignment.

(3) Equally irreconcilable is the statement contained in Gillig's June 1, 2005, declaration that he made an assignment to plaintiff that included "the right to sue for past, present, and future damages arising from any misappropriation or other wrongful use," *supra* at 685, with the descriptions Gillig gave of purported assignments in the sworn testimony he gave on February 23, 2004, June 14, 2005, and July 18, 2007.

Not only that, he gave conflicting testimony as to when an assignment was made. In direct conflict with Gillig's professed certainty when he testified on July 18, 2007, that the conversation that he took to be a verbal assignment occurred in September 2000 when he was conversing with Bronchick, his testimony on February 23, 2005, was that he did not know at what point in time his trade secrets and marketing plans were assigned by him to plaintiff.

No rational fact finder would give any credence to a witness who played a shell game such as Gillig did on the assignment subject. He should have been the most knowledgeable person on the subject of any assignment he might have made to plaintiff, and his testimony should have been straightforward and definitive. It was anything other than that. Obviously, he was making things up as he went along.

(4) As the first and only director or officer of plaintiff from a date shortly after plaintiff's formation in October 2000, its sole incorporator, and a significant shareholder of plaintiff from the outset, Fahmy certainly would have known if Gillig had made an assignment to plaintiff of the kind plaintiff says was made in exchange for the 3,950,000 shares of plaintiff's stock issued to Gillig. App. to Opp'n to Mot. to Dismiss at A–007. Yet, on April 8, 2005, Fahmy, after first saying that Gillig transferred his technology to plaintiff when it was formed, testified, when asked if he had any understanding as to whether Gillig assigned to plaintiff any trade secrets, that "there was a discussion about it at one point and I don't know what was the result of it." *Supra* at 684. He added that the discussion took place within three or four months before he gave his

deposition, and that he was not aware of any other information regarding any assignment from Gillig to plaintiff of any trade secrets or technology or confidential information. Until he was informed during his deposition of plaintiff's allegation that on or about October 13, 2000, Gillig assigned to plaintiff all of his trade secrets associated with his POWER-HEAD technology, he had no familiarity with such a transaction.

It is so implausible that Fahmy would not have knowledge of an assignment of the kind claimed by plaintiff if such an assignment existed that no reasonable fact finder would find that such an assignment occurred.

(5) The contrast between Fahmy's statement that Gillig had transferred his technology to plaintiff when it was formed, on the one hand, and his testimony that the first discussion there was of the possibility of Gillig assigning trade secrets to plaintiff occurred within three or four months before he gave his deposition in April 2005, on the other, is significant. The record reflects that Fahmy must have been talking about the corporate action taken on December 3, 2004, when he referred to a discussion about an assignment from Gillig to plaintiff of trade secrets that took place within three or four months before he testified.

A distinction is made in the December 3, 2004, corporate minutes and resolutions between "intellectual property rights" and "trade secrets." *Supra* at 681, 682. There was a discussion "regarding the securing of the intellectual property rights at issue in the Litigation"; and, "[i]n addition, ownership of the trade secrets which are related to ... the Nike Golf case were discussed." *Id.* at 681. The resolutions directed that plaintiff's attorneys "prepare an assignment of the trade secrets related to ...

the Nike Golf case from Jack Gillig to the Company." *Id.* at 682.

The distinctions made by Fahmy and in the corporate minutes and resolutions could well find an explanation in Gillig's testimony on February 23, 2005, when he distinguished trade secrets, marketing plans, and patents, indicating that some were "over here" and others "went over there." *Id.* at 683. The reasonable inference to be drawn is that, if there was any transfer from Gillig to plaintiff of intellectual property rights when plaintiff was formed, the transfer was of intellectual property rights other than the trade secrets at issue in this litigation. Otherwise, there would have been no need for an assignment of the trade secrets to be discussed in December 2004, followed by a resolution that the attorney obtain from Gillig an assignment of the trade secrets related to this litigation.

A fact finder is left to speculate what might have been the consideration for the stock of plaintiff that was issued to Gillig. As noted above, it could well have been other intellectual property rights, such as patent rights, or it could have been, or included, a license by Gillig to plaintiff to use his trade secrets. Absent the documentation that undoubtedly was created at or about the time plaintiff was formed in October 2000, the fact finder can do nothing but guess on that subject.

(6) By the time plaintiff filed its Rule 26(a)(1) initial disclosures in August 2004, it knew from defendants' answer that defendants had denied plaintiff's allegations relative to the assignment from Gillig to plaintiff, and had put plaintiff to "strict proof thereof" (*supra* at 680); and plaintiff knew that in July 2004 defendants had served a request for production that included a request to produce all documents comprising as-

signments affecting plaintiff's trade secrets. Yet, plaintiff did not show in its initial disclosures that Gillig, Fahmy, or Bronchick, who were listed in the disclosures as persons likely to have discoverable information relevant to plaintiff's claims, had any information concerning any assignment. This is in stark contrast with the contents of the declaration given by Bronchick on July 20, 2007, and the June 1, 2005, declaration of Gillig, by which each professed personal knowledge that there had been an assignment, and the testimony of Gillig that he, Fahmy, and Bronchick knew of the assignment document.

(7) If one were to give credence to Gillig's June 14, 2005, testimony that as of that date there was a document evidencing an assignment from him to plaintiff, the credibility of plaintiff's contentions relative to the nature of any such assignment are seriously impaired by the failure of plaintiff to disclose the assignment document to defendants or the court.

(8) Similarly, the credibility of plaintiff's claims relative to an assignment of Gillig to plaintiff before this action was filed is seriously impaired by the withholding by plaintiff until July 18, 2007, of the December 3, 2004, corporate minutes and resolution reflecting that on December 3, 2004, there was a discussion of the ownership of the trade secrets that are related to the instant action and that counsel for plaintiff in the instant action were instructed to prepare an assignment of the trade secrets. If plaintiff had honored its discovery obligations, there would have been a disclosure in 2005 of those minutes and resolutions and of whatever assignment document the attorneys prepared pursuant to that corporate action. The court infers from the withholding of the minutes and resolution until July of 2007 and the nondisclosure of whatever the attorneys prepared pursuant to the December 2004 corporate action that whatever was prepared would reveal information adverse to plaintiff's contentions relative to the timing and content of any assignment from Gillig to plaintiff.

(9) The fact that the corporate minutes were not disclosed on February 23, 2005, when plaintiff's deposition, through Gillig, was taken, is inexplicable. Plaintiff's deposition designee should have been prepared to give testimony relative to the corporate minutes and resolutions.

(10) There is no way the testimony given by Gillig on February 23, 2005, can be reconciled with the contents of the corporate minutes and resolutions of action taken December 3, 2004. The board of plaintiff recognized in December 2004 that there was a need to obtain ownership of the trade secrets involved in the instant action, and directed the attorneys representing plaintiff in this action to prepare an assignment of the trade secrets from Gillig to plaintiff. The shareholders dealt with the problem at the same time. Yet, when Gillig testified approximately two months later as the corporate designee of plaintiff on, among other subjects, the subject of any assignment between Gillig and plaintiff, he testified directly contrary to what the belatedly produced minutes and resolutions disclose, saying:

Q ....

... *Did you turn over to your attorneys the issue of memorializing any kind of assignment of trade secrets and marketing plans from Jack Gillig to Triple Tee Golf?*

....

A *No.*

....

Q *Because you felt that was some-
thing that didn't need to be dealt with,
with attorneys?*

. . . .

A They're separate. The trust and
trade secrets are separate, and mar-
keting plans are separate. The name
might be in there, the patent might be
in there, *but the trade secrets and any
of the stuff were all over here; they
never went over there.*

. . . .

Q But my question to you is: *Is
that Triple Tee Golf didn't feel that
was something it needed to deal with
its attorneys about, correct?*

. . . .

A *Yeah, I guess, yeah.*

*Supra* at 683–84. The inference reason-
ably to be drawn is that plaintiff has
been, and continues to be, hiding some-
thing that would be adverse to its "as-
signment" contention.

(11) Notwithstanding the representa-
tions of Gillig on June 14, 2005, that
there was in existence as of that date a
written assignment document, when
plaintiff finally produced an assignment
document on July 5, 2007, it turned out
to be a document that was not signed
until June 29, 2005. The pre-June 14,
2005, document (if one exists) has never
been produced.

(12) If, as plaintiff repeatedly has al-
leged, in October 2000 Gillig had as-
signed to plaintiff his trade secrets and
technology, plaintiff's officials, at the De-
cember 3, 2004, corporate meetings,
would have had no reason to discuss, as
they did at the meetings, "ownership of
the trade secrets which are related to
. . . the Nike Golf case" (*supra* at 681,
682). Much less would there have been
a need for a corporate resolution direct-
ing attorneys who are representing
plaintiff in this litigation to "prepare an
assignment of the trade secrets related

to . . . the Nike Golf case from Jack
Gillig, to the Company." *Id.* at 682.

(13) The contention of plaintiff that
the June 29, 2005, Bill of Sale and As-
signment simply reduced to written
form what verbally had occurred in Oc-
tober 2000 disintegrates when exposed
to the contents of the December 23,
2004, corporate minutes and resolutions.
Those documents as clearly as can be
said establish that as of December 2004
the plan was to obtain an assignment
from Gillig of the trade secrets related
to the instant action. Common sense
says that the documents would have said
that the plan was to obtain a written
confirmation, or memorialization, of an
assignment that already had been made
if, in fact, one had been made.

(14) Also inconsistent with the conten-
tion that there was an assignment from
Gillig to plaintiff in October 2000 is the
testimony Gillig gave at the July 18,
2007, hearing that, other than the writ-
ten Bill of Sale and Assignment he
signed June 29, 2005, the only thing that
occurred that he would consider to be an
assignment from him to plaintiff was a
conversation Gillig had with Bronchick
before plaintiff came into existence and
before Gillig's meeting with Stites. He
described the conversation as an inquiry
from Bronchick as to what was going
into the company. *Supra* at 686–87. Not
only is Gillig's hearing testimony con-
trary to the allegation plaintiff repeated-
ly has made that there was an assign-
ment from Gillig to plaintiff on or about
October 13, 2000, but the testimony con-
tradicts the testimony Gillig gave on
June 14, 2005, when he said that there
was a written document evidencing an
assignment from him to plaintiff and
that it was created in October 2000.

(15) The June 29, 2005, Bill of Sale
and Assignment recites that Gillig "ac-
knowledges and warrants that [plaintiff]

has had the full rights herein conveyed as of *October 20, 2000* the date that [plaintiff] issued to [Gillig] stock certificate Number 2 to [Gillig]." *Supra* at 686–87 (emphasis added). In contrast, when Gillig testified at the July 18, 2007, hearing, he said that the Bill of Sale and Assignment was prepared by attorneys who are representing him in this action *to confirm what had happened three or four weeks before plaintiff came into existence in October 2000.* Tr. of July 18, 2007, Hr'g at 19. In further contrast, the original and amended complaints all allege an assignment on or about *October 13, 2000.*

## C. Evaluating the Motion in a Rule 56 Context.

### 1. No Reasonable Finder of Fact Would Find the Existence of an Assignment to Plaintiff of Rights Essential to Claims Plaintiff Makes in this Action.

█ When defendants' motion is evaluated as a Rule 56 motion by application of the controlling standards, the conclusion that follows is that the motion should be granted. Even if the court were to assume, arguendo, that the summary judgment record contains some evidence that an assignment of the kind claimed by plaintiff was made, the grant of a summary judgment for defendants would nevertheless be proper under the summary judgment principles adopted by the Supreme Court. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court said that the standard for granting a motion for summary judgment "mirrors the standard for a directed verdict," which is that "the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Id.* at 250, 106 S.Ct. 2505. By its *en banc* decision in *Boeing Co. v. Ship-*

*man,* 411 F.2d 365 (5th Cir.1969) (en banc), the Fifth Circuit articulated for the guidance of the courts in this circuit the principles that must be applied in determining whether a motion for directed verdict is appropriate, saying, in pertinent part:

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper.

*Id.* at 374.

For the reasons given in subsection B above, the court concludes that "there can be but one reasonable conclusion as to the verdict" in this case, and that "reasonable men could not arrive at a contrary verdict." The verdict that reason requires is that plaintiff has failed to prove the existence of an assignment that gave it the right to initiate and prosecute this action.

### 2. There is no Summary Judgment Evidence that Gillig Assigned to Plaintiff Whatever Rights Gillig Acquired in his Dealings with Stites in September 2000.

Putting aside for the moment the issue of whether a reasonable fact finder could find that there was some kind of assignment of trade secrets from Gillig to plaintiff, plaintiff still is faced with the problem that there is no summary judgment evidence that Gillig assigned to plaintiff any of the rights he acquired in the course of his dealings with Stites in September 2000. Those alleged rights form the basis for each of plaintiff's claims. Therefore, sum-

mary dismissal would be appropriate for that reason if for none other.

Plaintiff undoubtedly would contend that the statement Gillig made in his June 1, 2005, declaration that he assigned to plaintiff the right to sue for past, present, and future damages arising from misappropriate or other wrongful use suffices as summary judgment evidence that Gillig assigned to plaintiff rights he acquired from Stites in September 2000. The first shortcoming of such a contention would be that the language used in the declaration simply does not say that the purported assignment to which the declaration refers was that broad. The second shortcoming, which is discussed in more detail under the heading that immediately follows, is that the "right to sue" language contained in Gillig's declaration has no evidentiary effect because it is contrary to sworn testimony he gave on three different occasions.

### 3. *Gillig's Testimony Controls Over His Declaration.*

There is not even a scintilla of reliable evidence that Gillig assigned to plaintiff the right to enforce any promise made by Stites to Gillig in September 2000. More generally, there is no reliable evidence that plaintiff acquired from Gillig any rights he might have had arising from his dealings with Stites or Stites, Inc., in September 2000, which would be an essential element of any right of plaintiff to sue for past, present, and future damages arising from any use of the trade secrets. The court recognizes that Gillig said in his June 1, 2005, declaration that he assigned to plaintiff "the right to sue for past, present, and future damages arising from any misappropriation or other wrongful use." *Supra* at 685. However, the attorney-prepared declaration of Gillig is valueless as evidence when exposed to the light of Gillig's

sworn deposition and hearing testimony. In *Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999), the Supreme Court observed that the lower courts

> have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity.

*Id.* at 806, 119 S.Ct. 1597. A well-settled rule is that the Fifth Circuit "does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony." *S.W.S. Erectors, Inc. v. Infax, Inc.,* 72 F.3d 489, 495 (5th Cir.1996).

■ Gillig was given multiple opportunities while testifying by deposition and in court on July 18, 2007, to make a full statement of everything he contends was assigned by him to plaintiff. On several occasions he described the things that were assigned, but on no occasion did he say in his testimony that any assignment he made to plaintiff included "the right to sue for past, present, and future damages arising from any misappropriation or wrongful use" or anything to that effect. On two of the occasions when Gillig gave testimony that was contrary to his declaration, he was testifying as a designee of plaintiff, thus causing the testimony to be plaintiff's as well as Gillig's. Neither plaintiff nor Gillig has ever provided an explanation for the discrepancies between the sworn testimony and the declaration.

Therefore, the court is giving no weight to Gillig's statement in his declaration that a "right to sue" was assigned.[5] The court

---

**5.** The fact that about two weeks after the declaration was signed by Gillig, he, when

asked about the declaration, said that there

would add that, even if some evidentiary effect were to be given to the statement, when the overall summary judgment record is considered the court, nevertheless, would conclude that no reasonable finder of fact would find that there was any such assignment.

### 4. *The June 29, 2006, Bill of Sale and Assignment Does Not Solve Plaintiff's Problem.*

■ One reason why the June 29, 2005, Bill of Sale and Assignment does not solve plaintiff's problem is that it does not purport to be an assignment from Gillig to plaintiff of whatever rights Gillig obtained vis-á-vis Stites or Stites, Inc., from his dealings with Stites on or about September 25, 2000. Another is that an assignment made over one-and-a-half years after this action was instituted cannot retroactively solve the standing problem that existed at the time the action was filed in the Southern District of Florida in January 2004. *See Gaia Techs., Inc. v. Reconversion Techs., Inc.,* 93 F.3d at 779–80. In *Gaia Techs.,* the Federal Circuit explained:

> As a general matter, parties should possess rights before seeking to have them vindicated in court. Allowing a subsequent assignment to automatically cure a standing defect would unjustifiably expand the number of people who are statutorily authorized to sue. Parties could justify the premature initiation of an action by averring to the court that their standing through assignment is imminent. Permitting non-owners and licensees the right to sue, so long as they eventually obtain the rights they seek to have redressed, would en-

mesh the judiciary in abstract disputes, risk multiple litigation, and provide incentives for ·parties to obtain assignments in order to expand their arsenal and the scope of litigation. Inevitably, delay and expense would be the order of the day.

*Id.* at 780 (quoting *Procter & Gamble Co. v. Paragon Trade Brands, Inc.,* 917 F.Supp. 305, 310 (D.Del.1995)).

### 5. *Even if Accepted at Face Value, the Conversation Gillig Said Occurred Between Him and Bronchick Before Plaintiff Came into Existence Does Not Help Plaintiff.*

■ If the court were to accept as truthful the most recent rendition by Gillig on July 18, 2007, of a pre-June 29, 2005, assignment, *supra* at 686–88, plaintiff would be no better off. To begin with, that conversation could not possibly have constituted an assignment to plaintiff of whatever rights Gillig acquired vis-á-vis Stites and Stites, Inc., from the dealings Gillig had with Stites after the conversation occurred and before plaintiff came into existence. Second, the only reasonable interpretation that can be given to Gillig's July 18, 2007, testimony is that his discussion with Bronchick was what he planned to do in the future. The prospect of an assignment in the future does not constitute an assignment. *Gaia Techs.,* 93 F.3d at 779.

### 6. *Defendants do have a Basis to Challenge the Purported Assignment.*

Relying on the opinion of the Fifth Circuit in *Imperial Residential Design, Inc.*

was a written document evidencing the assignment mentioned in the declaration, *supra* at 685, does not carry the day for plaintiff considering the other testimony given by Gillig that is contrary to the contents of the declaration. Gillig cannot bypass the rule of the Fifth Circuit that is mentioned in the text

by simply adopting a declaration without providing any explanation as to why it is contrary to his sworn testimony. Moreover, the written assignment to which Gillig referred on June 14, 2005, has never been produced by plaintiff.

v. *Palms Development Group, Inc.,* 70 F.3d 96 (11th Cir.1995), plaintiff argues in its opposition to the motion to dismiss that "where an assignor and assignee agree that an assignment occurred, a third party defendant (such as Defendants in this case) should not be permitted to argue that the assignee lacks standing." Opp'n to Mot. to Dismiss at 14. The court interprets plaintiff's argument to be, in effect, that even if there was no assignment from Gillig to plaintiff, with the result that plaintiff does not have ownership of rights essential to the claims it is asserting in this action, the defendant should not be able to complain if Gillig says that he endorses pursuit by plaintiff of the action. *Imperial Residential Design* does not begin to support such a proposition. Indeed, it supports the proposition that defendants have the right to, and can successfully, challenge the purported assignment plaintiff claims Gillig made to it.

*Imperial Residential Design* involved two suits. The first, filed in October 1990, was brought by an assignee ("Regal") of copyrighted design plans against persons it claims made unauthorized copies of the plans and used them for their own profit. *Id.* at 97–98. The assignment to Regal was in April 1990. *Id.* at 97. The defendants asserted as a defense that the April 1990 assignment did not carry with it any right the assignor had to sue for copyright infringements that occurred before the assignment. *Id.* In response, the assignor made a second assignment to Regal in May 19 91, which Regal claimed memorialized a pre-litigation oral assignment. The May 1991 assignment did transfer causes of action for pre-litigation infringement. *Id.* The district court dismissed the suit, holding that Regal lacked standing to bring the suit for the alleged infringements because the May 1991 assignment was not executed until after the suit was filed. *Id.* at 98. Regal appealed to the Eleventh Circuit, arguing that the district

court erred (a) in excluding the May 1991 assignment, (b) in finding that the April 1990 assignment included no right to sue for infringements occurring before the execution of the assignment, and (c) in finding that the April 1990 assignment did not memorialize the earlier oral agreement. *Id.* Up to that point in the litigation, there were factual parallels between *Imperial Residential Design* and the instant action. The Eleventh Circuit affirmed the district court's dismissal. *Id.* That decision by the Eleventh Circuit provides support for this court's decision to dismiss the instant action.

The second suit was filed by Regal in May 1992 against the same defendants complaining of infringement of the copyrighted design plans. *Id.* The assignor joined Regal as a plaintiff in the second suit. *Id.* Regal based its standing to sue on the May 1991 assignment. The district court excluded the May 1991 assignment from evidence. Based on that ruling, the defendants moved to dismiss Regal's claims for lack of standing. The district court denied the motion. This time the defendants appealed to the Eleventh Circuit. *Id.* The Eleventh Circuit remanded to the district court to clarify findings of fact and conclusions of law on the issue of standing. *Id.* On remand, the district court concluded that it had erred in not granting defendants' motion to dismiss Regal for lack of standing after having excluded the May 1991 assignment. *Id.* at 98–99. The case went back to the Eleventh Circuit, which ordered supplemental briefing on the issue of standing. *Id.* at 99.

Thus, the posture of *Imperial Residential Design* at the time of the opinion on which plaintiff relies was that the suit was filed after the assignment was made, the assignment not only transferred the intellectual property but also transferred the

right to sue for infringements that occurred before the assignment, and both the assignor and assignee were plaintiffs in the suit. Needless to say, the posture of the instant action is not remotely similar to *Imperial Residential Design*'s posture at the time of the opinion upon which plaintiff relies. When commenting that "where there is no dispute between the copyright owner and the transferee about the status of the copyright, it would be unusual and unwarranted to permit a third-party infringer to invoke section 204(a) to avoid suit for copyright infringement," *id.,* the Eleventh Circuit qualified its comment by saying "at least in a case such as this one—where both the original owner and the transferee have joined as plaintiffs in the same lawsuit—we will not let the alleged infringer invoke section 204(a)," *id.* Also, the Eleventh Circuit was careful to note that its ruling in favor of Regal was predicated on the fact that the assignment in issue had already been completed and signed when the lawsuit was filed, and that it cured any defects in Regal's standing to maintain the action.

For the reasons discussed above, the holding of the Eleventh Circuit in the first *Imperial Residential Design* appeal is authority supporting this court's conclusion that this action should be dismissed for lack of standing. The holding of the Eleventh Circuit in the second appeal does not have relevance to this action.

7. *Rule 17(a) Relief is not Appropriate.*

██ Although never having filed a motion for substitution of parties, plaintiff for the first time in its July 2007 opposition to the motion to dismiss makes an alternative suggestion to the court that substitution of parties under Rule 17(a) would be an appropriate action for the court to take if the court determines that Gillig is the real party in interest. The court disagrees.

██ The standard for determining whether the court should order a substitution of parties under 17(a) at a plaintiff's request was articulated in *Wieburg v. GTE Southwest, Inc.,* 272 F.3d 302, 308–09 (5th Cir.2001). The factors to be addressed are whether the plaintiff acted within a reasonable time after becoming aware of defendants' objection to the plaintiff's right to pursue the action or whether the plaintiff's pursuit of the action in its own name was the result of an understandable mistake. *Id.* at 308.

When the Fifth Circuit remanded *Wieburg* to the district court for further findings, the district court denied the requested substitution of parties, and dismissed the action for failure of the plaintiff to name the real party in interest. The plaintiff again appealed, and the Fifth Circuit affirmed. *Wieburg v. GTE Southwest, Inc.,* 71 Fed.Appx. 440, 2003 WL 21417074 (5th Cir.2003) (No. 02–11217). In the course of affirming, the Fifth Circuit said:

> To avoid dismissal, therefore, a plaintiff who is not the real party in interest must show, first, that he sued in his own name based on an understandable mistake and, second, that he did not have a reasonable time to correct the pleading deficiency.

*Id.* at *2.

In the instant action, plaintiff cannot satisfy either prong.

Plaintiff has known at all times since defendants filed their answer to the complaint in June 2004 that defendants were questioning that there was a valid assignment from Gillig to plaintiff and were putting plaintiff to strict proof thereof. The sequence of events described under section III of this memorandum opinion and order disclose that defendants repeatedly made known to plaintiff that defendants questioned the validity, even the existence, of an assignment of the kind claimed by

plaintiff. All documents constituting any such assignment were requested by defendants' document request in July 2004. When in January 2005 Nike, Inc., noticed the taking of the oral deposition of plaintiff, through its designee, it was specific in making known its concern about the alleged assignment by listing as one of the subjects to be covered on the deposition all facts supporting, refuting, or relating to the assignment claimed by plaintiff. When the deposition was taken pursuant to the notice, plaintiff, through Gillig, was interrogated at length concerning the purported assignment. Again, when defendants took the deposition of Fahmy in April 2005, they, through counsel, made penetrating inquiry concerning the existence and nature of any assignment. When defendants answered the third amended complaint in mid–2005, they again denied the allegations of plaintiff concerning the assignment, and put plaintiff to strict proof thereof. The questioning by defendants of Gillig when he gave his deposition in June 2005 again conveyed the message to plaintiff that defendants doubted the truthfulness of plaintiff's claim that it had the right to bring this action through an assignment from Gillig. Defendants made known in the pretrial order the court signed July 5, 2007, that they did not accept plaintiff's claim that it had a right to bring this action. At the July 5, 2007, pretrial conference defendants made known that they were contesting plaintiff's standing to bring this action.

Thus, plaintiff had known for more than three years that defendants were contesting plaintiff's standing to bring this action before plaintiff first made the suggestion in July 2007 in its opposition to defendants' motion to dismiss that a substitution of Gillig for plaintiff under Rule 17(a) might be an appropriate alternative to dismissal. The court finds that plaintiff had much more than a reasonable time to correct the deficiency its complaint suffers by reason of plaintiff's lack of standing to bring this action, and that it consciously chose not to do so notwithstanding repeated reminders over the years since this action was instituted that defendants did not accept, and were questioning, plaintiff's standing to institute and pursue the action. Plaintiff's alternative request comes much too late.

As to the other prong, plaintiff cannot show that it sued in its own name based on an understandable mistake. The court finds that, for whatever reason, plaintiff made a calculated decision to pursue this action in its own name with knowledge that it had not received from Gillig an assignment of whatever rights Gillig acquired through his dealings with Stites in September 2000. The court can only speculate as to reasons why plaintiff would have filed this action, and continue to pursue it, notwithstanding knowledge that it did not have a legal right to do so.[6] But, defendants do not need to establish affirmatively a bad motive for the bringing and pursuit of this action in plaintiff's name. Instead, plaintiff has the burden to show that it sued in its own name "based on an understandable mistake." The court finds that plaintiff has not made such a showing. Therefore, the court is not granting plaintiff's alternative request for Rule 17(a) relief.

### D. *Conclusion.*

For the reasons given above, the court has concluded that this action should be

**6.** For example, the court notes that Fahmy, the person who apparently was in control of the business affairs of the corporation, would have a motive as a significant shareholder of plaintiff to pursue this action in the corporation's name even if there was a legal question as to the corporation's right to do so. As the president and only director of plaintiff, Fahmy might well have been the moving force behind the institution and pursuit of this action even though plaintiff's standing was in issue.

dismissed. In reaching that conclusion, the court has applied Rule 56 standards. The dismissal is appropriate by reason of plaintiff's failure to establish standing as well as because of the failure of the summary judgment record to raise a genuine issue of fact as to an essential element of plaintiffs claim—that Gillig assigned to plaintiff whatever rights Gillig acquired from his dealings with Stites in September 2000.

## V.

### *Order*

Therefore,

The court ORDERS that the claims asserted by plaintiff against defendants in the above-captioned action be, and are hereby, dismissed.